1   STEINBRECHER & SPAN LLP
    ROBERT S. SPAN (SB# 68605)
2   rspan@steinbrecherspan.com
    DOUGLAS R. PAINTER (SB# 131043)
3   dpainter@steinbrecherspan.com
    445 S. Figueroa St., Suite 2350
4   Los Angeles, CA  90071
    T:  (213) 891-1400
5   F:  (213) 891-1470

6   LESNICK PRINCE & PAPPAS LLP
    MATTHEW A. LESNICK (SB# 177594)
7   matt@lesnickprince.com
    185 Pier Avenue, Suite 103
8   Santa Monica, CA  90405
    T:  (310) 396-0964
9   F:  (310) 396-0963

10  Attorneys for Plaintiffs KRASIMIR DACHEV, PEACE
    FOR YOU PEACE FOR ME and SVILOSA AD
11

12                  UNITED STATES BANKRUPTCY COURT

13                  CENTRAL DISTRICT OF CALIFORNIA

14                  SAN FERNANDO VALLEY DIVISION

15
    In re:                              Case No. 1:17-bk-12434-MT
16
                                        Chapter 7
17  ROBIN DIMAGGIO,
                                        Adv. No. _____
18              Debtor.
19  _____

20  KRASIMIR DACHEV, an individual,    COMPLAINT FOR:
    PEACE FOR YOU PEACE FOR ME, a
21  non-profit foundation organized under the   (1)  **DENIAL OF DEBTOR'S DISCHARGE**
    laws of Bulgaria, and SVILOSA AD, a        **[11 U.S.C. § 727]**
22  Joint Stock Company organized under the
    laws of Bulgaria,                   (2)  **DETERMINATION THAT DEBT IS NON-**
23                                           **DISCHARGEABLE**
                    Plaintiffs,             **[11 U.S.C. §§  523(a)(2)(A), 523(a)(2)(B),**
24                                           **523(a)(4), 523(a)(6)]**
        v.
25                                      [Status Conference Date to be Set by Court-Issued
    ROBIN DIMAGGIO,                     Summons]
26
                    Defendant.
27
    _____
28

Plaintiffs Krasimir Dachev, Peace For You Peace For Me and Svilosa AD ("Plaintiffs") allege as follows:

## JURISDICTION AND VENUE

1.      Pursuant to 28 U.S.C. §§ 1334 and 157 and the General Order of the United States District Court of the Central District of California referring all matters relating to bankruptcy to the bankruptcy judges, this Court has jurisdiction over this adversary proceeding, which arises in and relates to the above-captioned case under Title 11 and arises under Title 11. This adversary proceeding is a "core" proceeding, which this Court may hear and determine, within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (I), (J) and (O).

2.      Venue for this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409.

3.      This Court has jurisdiction to adjudicate the issues raised in this adversary proceeding by virtue of 28 U.S.C. § 1334.

## THE PARTIES

4.      Plaintiff Peace for You, Peace for Me Foundation (the "Foundation") is a private non-profit foundation registered under Bulgarian law and was formed to organize and hold a charity concert in Bulgaria for displaced children from conflict zones (the "Charity Event").

5.      Plaintiff Krasimir Dachev ("Dachev") is a resident of Sofia, Bulgaria and was a sponsor of the Foundation.

6.      Plaintiff Svilosa AD ("Svilosa") is a publicly traded Joint Stock Company listed on the Bulgarian Stock Exchange and was the primary investor in the Foundation and the Charity Event.  (The Foundation, Dachev and Svilosa are sometimes referred to collectively as "Plaintiffs.")

7.      Defendant Robin DiMaggio (the "Debtor" or "Dimaggio") is a resident of Los Angeles County, California and the Chief Executive Officer of DiMaggio International, Inc. ("DMI").  On information and belief, the Debtor, DMI's sole owner, exercised complete domination and control over DMI, with such a unity of interest and control between him and his

1    company that they cannot be construed as two separate entities or parties under the law.  Thus, all

2    actions or omissions herein attributable to one are equally attributable to the other.

3        8.        Plaintiffs are informed and believe and thereon allege that the Debtor and DMI

4    knowingly and willingly conspired and agreed to undertake the unlawful actions and omissions

5    alleged herein in furtherance of the common design alleged below.

6                    **<u>BACKGROUND AND SUMMARY</u>**

7        9.        This action involves a Los Angeles session musician and purported concert

8    promoter who deceived and defrauded Bulgarian charity organizers of over $1,000,000 under the

9    false pretext that he could and would use that money to secure celebrity musicians for a charity

10    concert.  After he took the money he demanded, he failed to secure the promised celebrities,

11    pocketed the money for himself and caused the collapse of the concert, causing damages to

12    Plaintiffs of over $4.5 million.  After he was sued for his wrongdoing, he produced in discovery

13    forged bank statements and forged check receipts in an effort to conceal his fraud.  Then, after his

14    company filed for bankruptcy protection earlier this year, he committed perjury at a creditors'

15    meeting, falsely claiming he did not use the approximate one million dollars Plaintiffs wired to

16    his company's bank account for personal expenditures.  The real statements produced by his bank

17    show that he transferred all of that money directly into his personal bank account within hours of

18    each wire.  None of these uses or transfers were disclosed in his Bankruptcy Schedules and

19    Statement of Financial Affairs filed in this action ("Schedules").  His fraud on Plaintiffs, on the

20    Superior Court and the bankruptcy estate provide grounds on which to deny discharge pursuant to

21    11 U.S.C. § 727 and to declare that the Debtor's debt to Plaintiffs is non-dischargeable under 11

22    U.S.C. § 523(a).

23        10.        Plaintiffs were organizers and/or investors in a planned charity concert event

24    ("Charity Event") that was to have taken place on October 1, 2016 in Sofia, Bulgaria.  The goal of

25    the Charity Event was to provide financial aid and attention to homeless and displaced children in

26    or from conflict zones and centered around a planned, internationally-televised concert of famous

27    musician celebrities.

28

11.    Around May 2016, DiMaggio, a session drummer and musician, represented to Plaintiffs that he was an American music promoter with major connections in the music industry, and had the expertise and ability to obtain commitments from famous musician celebrities to perform at the Charity Event; he also provided Plaintiffs with a written list of over 150 famous musician celebrities from which Plaintiffs could "pick."  Based on his representations, Plaintiffs and DMI entered into written agreements in which DiMaggio would secure these celebrities and be compensated later from commissions that would be applied against the celebrity contracts he secured.

12.    Starting around June 2016 and through August 2016, DiMaggio demanded a series of large payments from Plaintiffs, purportedly to use as "deposits" for the celebrity contracts he claimed he would obtain.  In reliance on DiMaggio's representations, Plaintiffs paid over $1,000,000 to DMI for this ostensible purpose.  Pursuant to the parties' written agreements, these funds were to be placed in an escrow account and were to be fully refundable if DiMaggio did not secure the promised contracts.

13.    As it turned out, DiMaggio did not have the expertise, ability or intention to secure the promised celebrities and, in fact, never secured a single celebrity artist for the Charity Event. DiMaggio also did not open the promised escrow account in which Plaintiffs' money was supposed to have been held, nor did he use the monies to secure celebrity artists, instead keeping Plaintiffs' money in his own bank accounts.  By early September 2016, when it became apparent that DiMaggio could not and would not fulfill his contractual obligations for the Charity Event (then less than four weeks away), Plaintiffs demanded the return of their money, pursuant to their written agreements.  DiMaggio repeatedly refused, first under the pretext that he had given these monies to artists' agents to secure their performances and was "waiting" for "refunds," and then under the pretext that he needed to keep the money to organize a future charity event with Plaintiffs, even though there was and is no agreement for such an event.

14.    In addition to the approximate $1,000,000 of Plaintiffs' money that DiMaggio has refused to return, Plaintiffs also incurred substantial liabilities relating to the Charity Event in reliance on DiMaggio's representations.  Such liabilities include approximately $2,500,000

4

expended as deposits and/or payments for artists, hosts, hotels, airfare, stage and lighting vendors and other service providers, and approximately $1,000,000 of unpaid contractual obligations associated with those expenditures.

15.    Based on the fraud alleged above, on December 27, 2017, Plaintiffs filed an action against the Debtor and DMI in the Los Angeles County Superior Court for, among other things, fraud, breach of contract and conversion.  *See Dachev v. DiMaggio et al.*, Case No. BC 645027 (the "State Court Action").  That same day, DMI filed a separate action against Plaintiffs in the Los Angeles County Superior Court for, among other things, breach of contract.  *See DiMaggio International Inc. v. Peace For You et al.,* Case No. LC104988.

16.    On June 12, 2017, DMI filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code.  *See In re DiMaggio International Inc.*, Case No. 1:17-bk-11560-VK (the "DMI Bankruptcy").  During discovery against the Debtor in the State Court Action, and as described more fully below, the Debtor produced falsified DMI bank records and check receipts in an effort to cover up his personal taking of the monies Plaintiffs wired to DMI.

17.    On September 12, 2017, the Debtor filed protection voluntary petition for relief under chapter 7 of the Bankruptcy Code, commencing the above-captioned bankruptcy case.  On October 20, 2017, at the §341(a) meeting of creditors in the DMI Bankruptcy, the Debtor (as the sole owner and representative testifying on behalf of DMI) falsely testified that he did not personally use the approximately million dollars Plaintiffs wired to the DMI account.  The unaltered records produced by the bank show that, every time Plaintiff wired money to the DMI account, the Debtor immediately transferred that money directly into his personal bank account, as described more fully below.

## FACTUAL ALLEGATIONS

18.    Around early 2016, Dachev and Svilosa decided to help organize and invest in a charity concert to help homeless and displaced children in world conflict zones.  In furtherance of this effort, they formed under Bulgarian law the non-profit Foundation, through which an all-day charity concert event, patterned after 1985's Live-Aid or 2010's Hope for Haiti Now, would be organized and internationally televised on October 1, 2016.

5

19.    In late May 2016, DiMaggio engaged in communications with the Foundation and its representatives, claiming that he was a well-known session drummer to celebrity artists and the "Musical Director of the United Nations" and could, through the celebrity connections he claimed to have developed in his years in the entertainment industry, procure commitments from numerous celebrity musicians to perform at the Charity Concert within the 16-week period before it was to take place.  Around this time, DiMaggio sent Plaintiffs an "Artist Acquisitions Roster" listing over 150 well-known musician celebrities from which Plaintiffs were to "pick," including but not limited to Adele, Stevie Wonder, Mick Jagger, Mariah Carey, Justin Timberlake, Rihanna, Lady Gaga, Maroon 5 and Snoop Dogg.  Around June 6, 2016, DiMaggio represented to Plaintiffs that he had received a "verbal yes" from Mick Jagger to perform at the Charity Event. He also claimed in an interview broadcast on Bulgarian television that he had discussed the Charity Event with Rod Stewart, Slash, Bruno Mars and Justin Timberlake.

20.    Based on DiMaggio's representations to Plaintiffs, around June 7, 2016, the Foundation and DMI entered into an "Engagement Binder" which provided, among other things, that all artist fees advanced by Plaintiffs would be "returned" at the "option" of the Foundation if an artist was "not available" or did not agree to the final contract offer approved by the Foundation.  A true and correct copy of this Engagement Binder is attached hereto as Exhibit A and incorporated herein.

21.    Around the latter half of June 2016, DiMaggio demanded the payment of funds pursuant to the Binder Agreement, writing to Plaintiffs with claims such as "Rod Stewart gave me a verbal yes so we are starting contracts with him.  He will be flying from London.  We have already 'officially' Sir Mick Jagger, Earth, Wind & Fire, Sir Rod Stewart and . . . KISS!" Plaintiffs complied with DiMaggio's funding request and sent him the monies he requested.

22.    Around July 7, 2016, DiMaggio represented to Plaintiffs that he had received verbal confirmations to perform from Johnny Depp, Earth Wind and Fire, Slash, Bruno Mars and Justin Timberlake, but that, unless Plaintiffs sent him more money immediately, the artists would be lost.  In reliance on DiMaggio's representations, around July 14, 2016, Plaintiffs sent DiMaggio another $150,000 as he had demanded to retain Mick Jagger and Earth, Wind and Fire.

The invoice for this payment, like the Binder Agreement, stated that the monies tendered by Plaintiffs would be "returned" at the "option" of the Foundation if an artist was "not available" or did not agree to the Foundation's contract offer.  A true and correct copy of this invoice ("Artist Invoice") is attached hereto as Exhibit B and incorporated herein.

23.    Around late July 2016, DiMaggio wrote to Plaintiffs that he had "confirmed" various additional artists for the Charity Event, including Blondie, The Beach Boys and Roger Waters of Pink Floyd, and conveyed specific details related to each artist's supposed contract requirements, including Jennifer Lopez's and Robbie Williams' alleged demands for a private jet to and from Bulgaria, travel requirements for each artist's personnel and the specific amount of money each artist supposedly required for a deposit.  He asked Plaintiffs for their "green light" on Jennifer Lopez, Robbie Williams and Don Henley of the Eagles so he could get "the legal done . . . ready to go finally."  DiMaggio, however, claimed that, in order for him to proceed with securing these artists, he would need another $750,000, in addition to the approximate $258,000 that Plaintiffs had already transferred to him.  Relying on DiMaggio's representations and claims that he was on the verge of finalizing contracts with these artists and "ready to go," around August 4, 2016, DMI and the Foundation entered into a written agreement ("August Contract") which provided for Plaintiffs' payment of another $750,000 within 5 days into an independent escrow account.

24.    The August Contract provided that such funds were to be used only for future celebrity contracts and that if DiMaggio did not secure an acceptable list of celebrity contracts, the monies would "be repaid in full to Purchaser in the first banking day following the end of the term [defined as October 3, 2016]."  It also provided that the Foundation would have final approval as to all artist contracts and that DiMaggio's remuneration would be obtained from commissions applied against future payments, after the closing of artist contracts.  A true and correct copy of the August Contract is attached hereto as Exhibit C and incorporated herein.

25.    Shortly after the August Contract was executed, DiMaggio wrote to Plaintiffs that he was "unable" to open the required escrow account within the 5-day payment period.  Instead of offering that Plaintiffs defer their payment until he opened the required escrow account,

7

DiMaggio claimed that the money had to be paid immediately, lest he lose the artists with whom he was supposedly on the verge of contracting.  Relying on DiMaggio's representations, Plaintiffs sent the entire $750,000 to the DMI bank account.

26.    DiMaggio never opened the promised escrow account and immediately transferred this $750,000 from the DMI bank account to his personal bank account, just as he had done with the $258,000 that Plaintiffs had previously sent to the DMI account.

27.    Despite the receipt of this additional $750,000 that was supposedly needed immediately, DiMaggio did not secure a single celebrity contract and did not provide any comprehensible explanation as to why he could not open the escrow account in which Plaintiffs' funds were supposed to have been placed.  By the latter half of August 2016, and after three months of empty promises, Plaintiffs, suspecting something was wrong, began looking for celebrity artists without DiMaggio's assistance, spending significant resources in the process.

28.    On August 22, 2016, Plaintiffs asked in writing for the return of their money, pursuant to the written terms to which the parties had agreed.  In response, DiMaggio first claimed that Plaintiffs' right to reimbursement could not occur until "everyone returns the deposits."  Plaintiffs, however, had not approved any celebrity contracts (of which there were none) through which a deposit could have been lawfully tendered.  Subsequently, on August 25, 2016, DiMaggio represented that he did not want to return any monies at all, so he could instead use that money to secure artists for a 2017 concert that the parties had briefly discussed.  Plaintiffs, however, had no agreement with DiMaggio for any 2017 concert and the idea was quickly abandoned by Plaintiffs, in part due to their increasing suspicions of DiMaggio's trustworthiness.

29.    In September 2016, less than four weeks from the Charity Event and without DiMaggio having secured a single celebrity contract, Plaintiffs made additional written demands for the return of their money.  DiMaggio refused those demands, and as of this date has refused all subsequent requests for the return of the $1,008,300 and has refused to provide any explanation or accounting for these monies.

8

30.    On information and belief:  (a) at no time did DiMaggio have any of the celebrity "commitments," verbal or otherwise, he claimed to have been given, and his numerous emails to Plaintiffs to the contrary were knowingly false and intended to induce Plaintiffs to give him more money; (b) DiMaggio's claims that he used Plaintiffs' monies for celebrity "deposits" were knowingly false, and there is no documentation of any unreturned money given as a deposit to secure any celebrity contract; (c) DiMaggio's repeated demands for payments, usually made on the cusp of phony news about a celebrity "almost" ready to commit, were intentionally deceptive and made for the sole purpose of extracting monies from Plaintiffs; (d) at no time did DiMaggio intend to open the escrow account he promised because he wanted to keep Plaintiffs' money for himself; and (e) at no time did DiMaggio believe that he could or would secure the celebrities he promised within the short amount of time before the Charity Event.

31.    Plaintiffs have since discovered that DiMaggio has been alleged to have engaged in the same pattern of deceptive behavior as alleged herein to dupe other, unsuspecting philanthropists and/or investors.  In the pending case of *Natwick v. Kelley, et al.*, Case No. BC615001, California Superior Court for the County of Los Angeles (filed March 24, 2016), an elderly investor alleges that DiMaggio committed fraud and elder abuse by taking over $117,000 of his money under false promises that he would help organize a "Save the Rainforest" concert that was allegedly to have been seen by over one billion viewers but which never materialized.  In the pending case of *Forum Entertainment Group, Inc. v. DiMaggio et al.*, Case No. BC520593, California Superior Court for the County of Los Angeles (filed September 6, 2013), an investor alleges that DiMaggio demanded a series of large payments to secure various celebrity artists for a for-profit concert, but after taking the money, never secured any of the promised artists and refused to return plaintiff's money.

32.    As a result of DiMaggio's acts and omissions as alleged herein, and in reliance on DiMaggio's false and deceptive representations, Plaintiffs (a) lost $1,008,300 of refundable payments tendered to DiMaggio; (b) made deposits and/or payments for artists, hosts, hotels, airfare, stage and lighting vendors and other service provider contracts totaling another

$2,500,000; and (c) carry another $1,000,000 of payment obligations under these contracts.  The total damage caused by Defendant therefore exceeds $4,500,000.

33.    After Plaintiffs filed the State Court Action against DiMaggio based on the above alleged wrongdoing, the Debtor produced discovery documents through which he attempted to show what he did with Plaintiffs' money, including an email chain, which he also filed with a pleading in the Los Angeles Superior Court, purportedly suggesting that his "fee" as of August 2016 had "reached" $450,000.  On information and belief, this email chain was a forgery:  the alleged August 12, 2016 email to K. Dachev contains no space between the month and the date (it reads "August12") (this line is normally auto-generated by an email server, not manually entered by an author) and has a space in the middle of the header (between the "date" line and the "to" line) which is not found in auto-generated headings.  The alleged August 13, 2016 email reply from Dachev to DiMaggio contains a "date" field ("Date: Aug 13, 2016 9:43 AM") which uses the U.S. style of date designation (month, calendar date, year), but the other emails sent to DiMaggio from this Bulgarian email address use the European style of date and time designation (calendar date, month, year) (for example: "Sent: Thu, 04 Aug 2016  09:52:44 +0300").  The text of this alleged email is also underlined in its entirety, which is inconsistent with other similarly addressed emails.

34.    Debtor also produced in the State Court Action a copy of an alleged receipt for a July 14, 2016 $600,000 bank check made payable to A.E.I., a purported booking agency.  This supposed receipt was similarly suspicious because it was dated before Plaintiffs had given him funds from which to make any such payment.  In an effort to show that DMI had money for this check before it had been paid by Plaintiffs, the Debtor then produced in the State Court Action a purported July 2016 "bank statement" for DMI that supposedly showed a balance of approximately $715,000, from which DMI supposedly issued the alleged $600,000 check.

35.    These documents were forgeries too.  The real bank check containing the same payee, serial number and date as that in DiMaggio's "bank receipt" was for $10,000, not $600,000.  As for the purported July 2016 DMI "bank statement" that DiMaggio produced to try to show that he had money for the alleged $600,000 check, the real bank statements produced by

the bank reveal that DiMaggio (a) deleted the "$36.89" checking summary at the top of the statement and replaced it with "------"; (b) changed the real beginning monthly balance of "662.41" to a fake balance of $715,662.41; and (c) inserted a fraudulent entry dated July 14 which reads "07/14 WITHDRAWAL 600,000.00."

36.    In short, the Debtor forged DMI documents in December 2016 that he produced in discovery and filed with the court in the State Court Action.  When confronted with the fact that these documents looked fake and made no sense, he then forged more documents (altered banks statements) to cover up his prior fraud.

37.    During his forgery-making, and on information and belief, DiMaggio intentionally deleted all emails and metadata relating to the State Court Action to destroy further evidence of his wrongdoing and refused a stipulated inspection of his computer.

38.    On September 12, 2017, based on the forged documents discussed above, Plaintiffs filed and hand-served a Motion for Terminating Sanctions in the State Court Action against the Debtor.  Several hours later, on that same day, the Debtor filed this bankruptcy case, approximately three months after DMI filed its bankruptcy petition.

39.    On October 2, 2017, the Debtor, as the sole owner of DMI, appeared at the § 341(a) meeting in the DMI Bankruptcy.  At the § 341(a) meeting, the Debtor testified, under oath, that he did not take money out of the DMI account for his personal benefit other than expenditures for attorney fees.  This was false.  According to the statements produced by DMI's and Debtor's bank, all of the approximate $1 million that Plaintiffs wired to the DMI bank account had been immediately transferred to the Debtor's personal bank account or withdrawn by him within hours of each wire:

- o    Early 2016 – DMI bank account carries an average balance of less than $300
- o    June 21 and 27, 2016 – the Foundation wires approximately $20,000 to the DMI bank account.  On June 27, 2016, Debtor makes 5 withdrawals from the DMI bank account totaling $17,287.

o   July 5, 2016: the Foundation wires approximately $15,000 to the DMI bank account. On that same day, the Debtor withdraws $13,000 from the DMI bank account and deposits it into his personal bank account.

o   July 6 and 14, 2016: the Foundation wires $155,555 to DMI account. On July 14, 2016, the Debtor withdraws $155,600 from the DMI bank account and deposits it into his personal bank account.

o   July 21, 2016: the Foundation wires $53,300 to the DMI account. On that same day, the Debtor withdraws $53,251 from the DMI bank account and deposits it into his personal bank account.

o   August 5, 2016: the Foundation wires $750,000 to the DMI account. On August 8, 2016, the Debtor withdraws $750,000 from the DMI bank account and deposits it into his personal bank account.

40.    Of the approximate one million dollars of Plaintiffs' money the Debtor took from the DMI account, he spent (a) $150,000 to fund another one-man company called DiMagic Entertainment, Inc. ("DiMagic") that continued operations after he closed DMI on September 10, 2016; said account, which was in the Debtor's exclusive control and for his exclusive benefit, remained open and with a six-figure balance through March 2017; and (b) $251,370 to open an escrow account on or around August 22, 2016, with him as the beneficiary, with Santa Clarita Valley Escrow (a residential home escrow company). From June 2016 through October 31, 2016, he used the rest of the approximate million dollars Plaintiffs wired to the DMI account to fund a series of other personal withdrawals, charges and expenditures from his personal bank account, so that by October 31, 2016, the balance in his personal bank account had dropped from a high exceeding $750,000 to less than $2,000, which the Debtor has not accounted for.

41.    The Schedules filed by the Debtor in this bankruptcy case do not disclose any of the transfers or balances described above or the existence of the DiMagic Entertainment, Inc. account or the Debtor's ownership of DiMagic Entertainment or any purchase associated with the funds transferred to Santa Clarity Valley Escrow.

## FIRST CLAIM FOR RELIEF

### (Nondischargeability – 11 U.S.C. § 727(a)(2))

42.      Plaintiffs incorporate the above paragraphs as though fully set forth herein.

43.      The Debtor should be denied a discharge under § 727(a)(2)(A) because, "with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, [he] has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the debtor, within one year before the date of the filing of the petition," including, without limitation, concealing the money he took from DMI, his ownership interest in DiMagic, and the funds transferred to Santa Clarita Valley Escrow or the property or other asset purchased with those funds (the "Concealed Assets").

44.      The Debtor should be denied a discharge under § 727(a)(2)(B) because, "with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, [he] has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the estate," including, without limitation, concealing the Concealed Assets in his pleadings and testimony.

## SECOND CLAIM FOR RELIEF

### (Nondischargeability – 11 U.S.C. § 727(a)(3))

45.      Plaintiffs incorporate the above paragraphs as though fully set forth herein.

46.      The Debtor should be denied a discharge under § 727(a)(3) because he has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained," including, without limitation, by creating the falsified bank records described above and failure to account for the funds transferred to Santa Clarity Valley Escrow or the proceeds of such funds.

## THIRD CLAIM FOR RELIEF

### (Nondischargeability – 11 U.S.C. § 727(a)(4))

47.      Plaintiffs incorporate the above paragraphs as though fully set forth herein.

48.     By filing materially false Schedules and by providing false testimony as alleged herein including, without limitation, false testimony and Schedules regarding the Concealed Assets, the Debtor should be denied a discharge because he knowingly and fraudulently "made a false oath or account" under § 727(a)(4)(A).

49.     By filing materially false Schedules and by providing false testimony as alleged herein including, without limitation, withholding information and documents in his testimony and Schedules regarding the Concealed Assets, the Debtor should be denied a discharge because he "withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs" under § 727(a)(4)(D).

**FOURTH CLAIM FOR RELIEF**

**(Nondischargeability – 11 U.S.C. § 727(a)(5))**

50.     Plaintiffs incorporate the above paragraphs as though fully set forth herein.

51.     The Debtor should be denied a discharge under § 727(a)(5) because he "has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities," including, without limitation, failing to account for the Concealed Assets.

**FIFTH CLAIM FOR RELIEF**

**(Determination that Debt Not Dischargeable - 11 U.S.C. § 523(a)(2)(A))**

52.     Plaintiffs incorporate the above paragraphs as though fully set forth herein.

53.     The representations and actions of the Debtor, including but not limited to those relating to (a) the alleged use of Plaintiffs' monies for celebrity contract deposits; (b) the celebrity "commitments" or "confirmations" by Earth, Wind and Fire, Slash, Bruno Mars, Justin Timberlake, The Beach Boys, Roger Waters, Jennifer Lopez and Robbi Williams, among others; (c) the alleged inability to open an escrow account as required by the August Contract; (d) the repeated claims of the need for additional monies to secure celebrity artists; (e) the alleged ability and intention to secure the celebrities required for the Charity Event in time for the October 1,

2016 concert date; (f) the personal use of the approximate $1,000,000 that was sent to DMI's

bank account, were knowingly false when made and intended to induce Plaintiffs to act thereon.

54.    Plaintiffs reasonably and justifiably relied on the misrepresentations and deceit of

the Debtor and had no reason to believe that the Debtor was defrauding them.

55.    As a proximate result of the Debtor's misrepresentations and deceit, Plaintiffs have

sustained damages in excess of $4.5 million, plus interest, attorney fees and costs.

56.    The Debtor performed these acts and omissions with malice, fraud and oppression

and is therefore liable to Plaintiffs for punitive damages pursuant to Civil Code § 3294.

57.    As a result of the Debtor's false pretenses, false representations and/or actual

fraudulent acts described above, the Debtor's indebtedness to Plaintiffs is nondischargeable under

11 U.S.C. § 523(a)(2).

### **SIXTH CLAIM FOR RELIEF**

### **(Determination that Debt Not Dischargeable - 11 U.S.C. § 523(a)(4))**

58.    Plaintiffs incorporate the above paragraphs as though fully set forth herein.

59.    The Debtor's indebtedness to Plaintiffs alleged herein arose from fraud or

defalcation while acting in a fiduciary capacity, embezzlement, or larceny including, without

limitation, the Debtor's defalcation of his written promise to place Plaintiffs' money in an escrow

account and to hold Plaintiffs' money pending certain conditions and return the funds to Plaintiffs

upon request.  As a result, the Debtor's wrongful actions constituted fraud and/or defalcation

while acting in a fiduciary capacity.

60.    As a direct and proximate result, Plaintiffs have sustained damages in excess of

$4.5 million, plus interest, attorney fees and costs.

61.    The Debtor performed these acts and omissions with malice, fraud and oppression

and is therefore liable to Plaintiffs for punitive damages pursuant to Civil Code § 3294.

62.    The Debtor's indebtedness to Plaintiffs is nondischargeable under 11 U.S.C.

§ 523(a)(4).

## SEVENTH CLAIM FOR RELIEF

## (Determination that Debt Not Dischargeable - 11 U.S.C. § 523(a)(6))

63.    Plaintiffs incorporate the above paragraphs as though fully set forth herein.

64.    The acts and omissions alleged herein constitute willful and malicious injury by the Debtor to Plaintiffs and, therefore, constitute grounds for a determination that his debt to Plaintiffs is not dischargeable.

65.    The Debtor's indebtedness to Plaintiffs is nondischargeable under 11 U.S.C. § 523(a)(6).

## ATTORNEY FEES AND COSTS

66.    Plaintiffs incorporate the above paragraphs as though fully set forth herein.

67.    As a direct result of the Debtor's conduct, Plaintiffs have been required to retain the services of Steinbrecher & Span LLP of Los Angeles, California, to prosecute this action on their behalf.  Plaintiffs are entitled to recover their costs and reasonable attorney fees incurred for the prosecution of this action.

WHEREFORE, Plaintiff prays for Judgment against the Debtor as follows:

1.    A denial of the Debtor's discharge pursuant to 11 U.S.C. § 727(a);

2.    A determination by this Court that the above-alleged indebtedness owed to Plaintiffs is non-dischargeable pursuant to 11 U S.C. §§ 523(a);

3.    Judgment against Debtor for all damages caused, including the sum in excess of $4.5 million, plus accrued legal interest thereon;

4.    For punitive damages against Debtor and in favor of Plaintiffs;

5.    Judgment for Plaintiffs' costs and expenses, including reasonable attorney fees and costs; and

//

//

//

//

6.    For such further relief as the Court may deem just and proper.

Dated:  November 28, 2017                    STEINBRECHER & SPAN LLP
                                             ROBERT S. SPAN
                                             DOUGLAS R. PAINTER

                                             and

                                             LESNICK PRINCE & PAPPAS LLP
                                             MATTHEW A. LESNICK


                                             By:_____/s/ Matthew A. Lesnick_____
                                                         Matthew A. Lesnick

                                             Attorneys for Plaintiffs KRASIMIR DACHEV,
                                             PEACE FOR YOU PEACE FOR ME and
                                             SVILOSA AD

**EXHIBIT A**



AEI ENTERTAINMENT BROKERAGE FIRM
ENGAGEMENT BINDER

REVISION #4

Date:   JUNE 6th  2016
To:     PEACE FOR YOU PEACE FOR ME FOUNDATION
        100, Maria Luisa Blvd.  Sofia, 1202 Bulgaria
        c/o: J Botev

## ARTIST & PRODUCTION REQUESTED:

## Binder Fee: $50,000.00 USD (BINDER FEE)

Provisions: Full rider requirements to include sound, lights, backline equipment, flight travel plus hotels and local ground transportation.

Please feel free to contact me with any questions and please RETURN back to both email(s): thedimaggio@gmail.com / aei.ivp@gmail.com

This engagement offer confirms our conversation with respect to the non-exclusive performance on: OCTOBER 1ST 2016

Please see the offer below:

1.  BUYER(S):              PEACE FOR YOU PEACE FOR ME FOUNDATION

2.  EVENT NAME:            PEACE FOR YOU PEACE FOR ME

3.  NATURE OF DATE:        HIGH PROFILE CHARITY CONCERT

4.  LOCATION:              SOFIA, BULGARIA

5.  PRODUCTION CO.         DIMAGGIO INTERNATIONAL, INC.

6.  ARTIST:                VARIOUS A & B LIST ARTIST ACQUISITIONS (line-up tba)

7.  DATE:                  OCTOBER 1ST 2016

8.  SHOW DURATION:         2:00 PM to 8:00 PM - first part
                           8:00 PM - 12:00 AM - second part

9.  VENUE CAPACITY:        43,230

10. VENUE NAME:            "VASIL LEVESKII" Sofia, Bulgaria.

PROMOTER REPRESENTATIVE:                    PRODUCER OR REPRESENTATIVE:

PEACE FOR YOU PEACE FOR ME FOUNDATION       DIMAGGIO INTERNATIONAL, INC.
J Botev  (Organizer / Promoter)             Robin DiMaggio (Producer)

Date: 7.06.2016                             Date: 5 30 2016
An Authorized Signator                      An Authorized Signatory

a RISE MEDIA collective association         The Nation's Premiere Entertainment Development Fi-

DIMAGGIO INTERNATIONAL INC. will make its best effort to secure the artist for the event.

ARTIST & PRODUCTION TERMS

# PRODUCER BINDER FEE:      $ 50,000.00    USD

# PRODUCTION COST:      $ 150,000.00    USD

# VARIOUS ARTIST Artist Fees:      $ 1,000.000.00    USD

Please be advised that upon the receipt of $50,000.00 (Fifty Thousand Dollars USD) binder fee will be above the line for the PRODUCER to obtain the artist and production needs above.

You will have (1) Week to send binder fee of $50,000.00 (Fifty Thousand Dollars USD) as per OUR binder agreement above.

The binder deposit must be received via bank wire and is non-refundable with the following exclusions:

Provisions: Full rider requirements to include Staging, Local Union Crew, Stage Manager, Sound Lights, Backline Equipment, Flight Travel plus Hotels and Local Ground Transportation.

DIMAGGIO INTERNATIONAL INC. will secure the Artists and Production for IPEACE 4 YOU PEACE 4 ME FOUNDATION and when the artist and production deposits are applied to artist guarantees, and all production vendors, at that time contracts will be issued accordingly.

If the Artist is not available or does not accept your offer, Artist fees will be applied towards another artist(s) or returned if the artist declines your offer and is willing to accept an offer at a higher fee, you will have the option of paying the higher fee or having your funds returned.

Your signature where indicated will act as your agreement and acceptance to the above stated terms.

Please feel free to contact me with any questions and please RETURN back to me at email: aei.ivp@gmail.com and thedimaggio@gmail.com

## WIRE INSTRUCTIONS FOR DEPOSIT:

Please indicate your wire transaction information:

NAME OR COMPANY NAME: DIMAGGIO INTERNATIONAL INC.
BANK NAME: CITI BANK, N.A. BRANCH #731
BANK ADDRESS: 3967-AE THOUSAND OAK BLVD
COUNTRY: USA
CITY: WEST LAKE VILLAGE          STATE: CALIFORNIA          ZIP: 91362

BANK ACCOUNT #204775621

BANK ROUTING #322271724

SWIFT CODE - citius33

**EXHIBIT  B**



# DIMAGGIO INTERNATIONAL, INC.

### ARTIST AQUISISIONS INVOICE

| | |
|---|---|
| **INVOICE NO#:** | #DII-001-ART-P4UP4M-AAI |
| **LABEL/VENDOR:** | **PEACE FOR YOU**<br>**PEACE FOR ME FOUNDATION**<br>100, Maria Luisa Blvd.<br>Sofia, 1202 Bulgaria<br>c/o: Jay Botef |
| **DATE of EVENT:** | OCTOBER 1ST 2016 |
| **PROJECT DESCRIPTION:** | **PEACE FOR YOU**<br>**PEACE FOR ME CONCERT** |
| **ARTIST AQUISISIONS:** | ARTIST FEES & DEPOSITS |

**PAYMENT DEPOSITS:**

| | | |
|---|---|---|
| ARTIST NAME; | MICK JAGGER: | $100,000.00 |
| ARTIST NAME; | EARTH, WIND & FIRE: | $ 50,000.00 |

Direct Deposit Payable to:

**DIMAGGIO INTERNATIONAL, INC.**
5737 Kanan Road #117
Agoura Hills, CA 91301
EIN: #0617908

**CITI BANK**
3967 a-e Thousand Oaks Blvd.
Westlake Village, California
91362 USA
**Bank Account: # 204775621**
**Routing: #322271724**
SWIFT CODE – citius33

## ADDENDUM TO INVOICE:

DIMAGGIO INTERNATIONAL INC. will make its best effort to secure the artist for the event.

## ARTISTS REQUESTED:

# MICK JAGGER:                    $  100,000.00 USD

# EARTH, WIND & FIRE:            $   50,000.00 USD

\DIMAGGIO INTERNATIONAL INC. will secure the Artists and Production for **PEACE FOR YOU, PEACE FOR ME CONCERT** and if and when the artist and production deposit fees to artist guarantees, and all production vendors, at that time contracts will be issued accordingly.

If the Artist is not available or does not accept your offer, Artist fees will be applied towards another artist(s) and if any artist have NOT accept your offer and is willing to accept your offer will have the option of declining the offer and funds will be returned with a cancellation clause applicable to the artist fees.

Please feel free to contact me with any questions and please RETURN back to me at email: **thedimaggio@gmail.com**

**ALL PROVISIONS WILL BE APPLICABLE FROM THE PROMOTER AS FOLLOWS:**

Full rider requirements to include Staging, Local Union Crew, Stage Manager, Sound Lights, Backline Equipment, Flight Travel plus Hotels and Local Ground Transportation.

**EXHIBIT C**

# DII

# DIMAGGIO INTERNATIONAL, INC.

Kris Dachev (the Purchaser)

DiMaggio International Inc. (The Agency)

Taking for granted that DiMaggio International, Inc. is fully comparable and experienced with Talent Brokerage Agency...

This letter of Engagement is to confirm that KRIS DACHEV & ASSOCIATES (hereinafter known as "PURCHASER").
Like to acknowledge professional brokerage services facilitated by DIMAGGIO INTERNATIONAL, INC.
(collectively referred to as "AGENCY")

The Purchaser is willing to use the Agency expertise in engagement of various artists (Artist/s) for their participation in the Event.

EVENT: Purchaser represents PEACE FOR YOU PEACE FOR ME FOUNDATION (the Foundation) in organizing a concert in Bulgaria (the Event).
LOCATION: The Event is planned for October 1, 2016 in Sofia town, at The National Stadium Vasil Levski, address: 38, Evlogi i Hristo Georgievi, 1000 Sofia, Bulgaria.

The Parties concluded this Agreement as follows:

1. SUBJECT OF THIS AGREEMENT: the Agency undertakes to cooperate with and to facilitate the Foundation in concluding contracts with Artists, specified in this Agreement, for participation in the Event.

2. The List of Artists describes the names, which the Agency undertakes to engage for the Subject of the Agreement.

3. As a result of consultations between the Parties the list of Artists could be amended from time to time and the Parties shall sign the respective amendment to this Agreement.

4. LIST OF ARTISTS:
   a. JENNIFER LOPEZ
   b. ROGER WALTERS
   c. JOHN LEGEND
   d. CHRISTINA AGUILERA
   e. ROBBI WILLIAMS
   f. DON FELDER

5. The Term of this Agreement is until OCTOBER 3RD 2016.

6. Purchaser shall transfer $750,000.00 (Seven Hundred & Fifty Thousand Dollars USD) to transfer into Agency Escrow account (Escrow) as a Guarantee for future payments related to Artists engaged with participation in the Event.

7. The term for the transfer the Guarantee is 5 banking days from receiving with Purchaser of the Escrow agreement.

8. Agency remuneration fees shall obtained thru commissions of the services of the Artist upon closing of the agreement from Artists fees.

9. The Subject of the Contract shall be deemed successfully fulfilled provided at least 20 names from the List of Artists are contracted for the Event during the Term of Agreement. Otherwise the Subject is not fulfilled and the Guarantee shall be repaid in full to Purchaser in the first banking day following the end of the Term

NEW YORK     ◆     LOS ANGELES     ◆     LONDON     ◆     PARIS



# DIMAGGIO INTERNATIONAL, INC.

10. Not later than the next day after signing this Agreement the Agency shall e-mail the drafts of and the links to the entire documentation such as contracts, Artists terms and conditions etc., which are expected to be agreed, signed and executed by the Foundation (Artists Requirements). Once the Parties agreed on a specific Artists Requirements, the respective amount for this Artist shall be released from Escrow.

11. If the Parties could not agree on a specific Artists Requirements, as the case may be:
    a.   This Artist shall be removed from the List and the List of Artists shall be amended accordingly;
    b.  Whilst within the Term of this Agreement, after preliminary Purchaser's acceptance in writing (including e-mail), this Artist could be replaced with another one. In this case the List of Artists shall be amended accordingly;

12. In case this Agreement is expired the remaining amount (if any) in the Escrow shall be transferred back to the Purchaser within 30 days after the term of this agreement.

13. The Agency is not entitled to:
    a.   Undertake any liabilities or enter in any kind of contracts, or amend already agreed contracts, on behalf of the Purchaser without prior Purchaser's approval by e-mail or authorization in writing;
    b.  Negotiate under this Agreement with artists who are not in the List of Artists, except prior Purchaser's approval by e-mail;

14. The Purchaser does not bear any responsibility for any Agency expenses, loses whatsoever.

15. The Parties bank accounts: please see invoice provided by AGENCY: DIMAGGIO INTERNATIONAL, INC.

16. The Parties e-mail addresses and telephone numbers:
    a.   For the Agency: thedimaggio@gmail.com
    b.  For the Purchaser: kdachev@mtgbg.com

17. Each one Agency and the Purchaser separately declares:
    a.  By entering in this Agreement does not violate any national law in the respective place of incorporation, constitutive act or internal rules;
    b.  Persons who signed this Agreement and will sign eventual amendments to it are and will be duly authorized;
    c.  Each Party shall treat as Confidential Information all the e-mails, letters and documents received from the other Party
    d.  Each Party shall:
        i.   not disclose the Confidential Information to any third party;
        ii.  Not use the Confidential Information for any purpose unless in connection with the execution of tasks under projects, contracts and activities agreed between the Parties;
        iii.  Take any action on the protection of the Confidential Information from destruction, loss, change or damage;
        iv.  Keep properly the submitted Confidential Information by simply restrict access to it and prevent it from spreading through printing, forwarding, copying or sharing by any means except with prior approval of issuing Party.

18. Any dispute, controversy or claim arising out of or in connection with this Agreement will be finally settled under the law, applicable at the seat of the Agency:

PURCHASER: KRIS DACHEV & ASSOCIATES               AGENCY: DIMAGGIO INTERNATIONAL, INC.

_____  04.08.2016        _____  08-03-16
Signatory           (date)               Signatory           (date)

NEW YORK    &#9670;    LOS ANGELES    &#9670;    LONDON    &#9670;    PARIS